RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0240P (6th Cir.)
File Name:  00a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*



No. 98-6217

JOSE ANTONIO
CASESLORENTE,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 97-20091—Jerome Turner, District Judge.

Argued:  December 9, 1999

Decided and Filed:  July 20, 2000

Before:  BOGGS and SUHREINRICH, Circuit Judges;
POLSTER, District Judge.[*]

_____

[*]The Honorable Dan Aaron Polster, United States District Judge for
the Northern District of Ohio, sitting by designation.

1

————————————

**COUNSEL**

**ARGUED:** Stephen B. Shankman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Cam Towers Jones, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Stephen B. Shankman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Tracy L. Berry, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

————————————

**OPINION**

————————————

POLSTER, District Judge. Defendant Jose Antonio Caseslorente appeals from his jury conviction for theft of government property, conspiracy to steal government property, interstate transportation of stolen goods, and mail fraud on the basis that, under 18 U.S.C. § 641, the United States failed to prove that the stolen property belonged to the government. Caseslorente also appeals from the district court's enhancement of his sentence under U.S.S.G. § 3B1.1(c) for his role in the offenses. For the following reasons, we AFFIRM.

**I.**

Caseslorente was a Chief Petty Officer at the Naval Base in Millington, Tennessee. As part of his naval duties, Caseslorente was assigned to work at the Naval Support Activity Memphis Recycling Center (the "Center" or "Recycling Center") which was located on the base. Although Caseslorente testified to not officially being named manager of the Center until June 1995, sufficient evidence

§ 3B1.1(c), he does so to no avail.  The evidence and the district court's findings are sufficient to support the sentence enhancement.  For all these reasons, the judgment of the district court is **AFFIRMED.**

shows that he was in fact in charge before that time.[1]  In addition to sailors, the Center employed inmates from the Millington Prison Camp.

The Center collected scrap aluminum cans, pasteboard, and other recyclables from persons living on the base and from the surrounding Millington community.  The Navy had a contractual arrangement with the city of Millington whereby the Navy would pick up the recyclables in exchange for keeping any revenue derived therefrom.  The collected material was taken to the Recycling Center where it was sorted, cleaned, baled and stored until such time as it could be sold to vendors.  Once the recyclables were baled, they were either picked up by, or delivered to, the government's vendors in government trucks or civilian contractor vehicles.  Under no circumstances were private vehicles to be used for the transportation of this material.  Nonetheless, on at least three occasions Caseslorente delivered baled materials to Iskiwitz Metals after hours in his personal truck.

All proceeds for the recycling activity went to the Morale, Welfare, and Recreation ("MWR") Department of the Navy where they were deposited in a fund benefitting programs for sailors and their dependents.  The Navy billed the vendors directly, and directed that payment be remitted to the MWR Department by check made payable to the MWR Department.

---

[1] Base Commanding Officer Captain James Mallory testified that Caseslorente was in charge of the Center.  Petty Officer Gardner, who worked at the Center, testified that Caseslorente appeared to him to be in charge.  Although Caseslorente reported to the Senior Chief Petty Officer who stopped by every week or so, he otherwise had no direct supervision.  His duties were managerial, i.e., he dealt with vendors, negotiated the price of the recyclables, decided what to sell to whom, received inventory reports, reported material sold, and supervised personnel.

As a Chief Petty Officer, Caseslorente was one grade senior to all other sailors working at the Recycling Center.  Division Officer Larry Delooze testified that a chief petty officer was assigned to the Center because of the number of military personnel working there, the dollar value of the recyclables, and the distance from the remainder of the MWR Department.  Thus, for all practical purposes, Caseslorente managed the Recycling Center.

No one at the Recycling Center was authorized to accept payment for the recyclables. However, the MWR Department occasionally received checks payable to Caseslorente. While the Department processed these particular checks for a time, Caseslorente eventually told the Department that he would pick them up.

Petty Officer Robert Robinson, a Recycling Center employee, testified that he conspired with Caseslorente to steal and sell cardboard and aluminum cans. He testified that Caseslorente arranged the shipments of the baled recyclables, and Robinson agreed to have the checks sent to Robinson at his home address. The record shows that, shortly after the criminal scheme began, Robinson received a check at his home made payable to the MWR Department. He immediately took this check to Caseslorente, who resolved the problem himself.[2] Robinson testified to three occasions on which he and Caseslorente delivered and sold aluminum cans to Iskiwitz Metals after hours in Caseslorente's own truck. Robinson also testified that he asked Caseslorente for permission to quit the conspiracy, but Caseslorente would not let him, and that Caseslorente once checked him for a surveillance wire.

Employees of various paper vendors and trucking companies testified to certain irregular transactions. An employee of Recycled Fibers testified that a check made out to "MWR Fund, R. Robinson" was replaced, upon request, with a check made out simply to "R. Robinson." The company issued a second check to the same name for payment on a subsequent occasion. On a third occasion, Recycled Fibers issued a check for payment to Stacy Gatley, a name provided by Robinson. A driver for Builders Transport, Inc. testified to transporting 40,000 pounds of corrugated cardboard from Millington to Recycled Fibers in

---

[2] Caseslorente called the vendor and told it to issue another check payable to Robinson. Approximately one week later, Robinson received a second check in his name, cashed it and split the proceeds with Caseslorente.

---

credited Robinson's testimony over Caseslorente's on the issue of who directed whom in this scheme. The credibility of witnesses is a matter for the trial court, and the court's determinations must be given substantial deference. *See United States v. Gessa*, 57 F.3d 493, 496 (6th Cir.), *cert. denied*, 516 U.S. 698 (1996); *United States v. Aloi*, 9 F.3d 438, 440 (6th Cir.1993). Thus, even though the district court may have erred in stating that § 3B1.1(c) would permit sentence enhancement in the absence of evidence that Caseslorente led, organized, managed, or supervised Robinson, its discussion of the evidence reveals facts to support the conclusion that Caseslorente exerted control over Robinson, and those factual findings were not clearly erroneous. Thus, enhancement of Caseslorente's sentence under § 3B1.1(c) was proper.[8]

### IV.

Sufficient evidence demonstrates that the baled recyclables Caseslorente stole belonged to the government under 18 U.S.C. § 641. The Navy considered the recyclables that it collected and processed to be government property, the government exercised every indicia of ownership over these recyclables, and they shared the attributes of other property found to belong to the government in prior cases.

Likewise, evidence supports the enhancement of Caseslorente's offense level for managing another participant in the criminal scheme. Although Caseslorente correctly points out a possible disagreement in this Circuit's case law on the proper standard to be employed under U.S.S.G.

---

[8] Although the district court ruled only on the question of a sentence enhancement, there was, in the alternative, sufficient evidence to support an upward departure in Caseslorente's sentence under §3B1.1(c). Evidence showed that he conceived of the scheme, divided the proceeds, refused to let Robinson leave the conspiracy when he sought to get out, asked Robinson whether anyone was investigating defendant and checked Robinson for a wire. The testimony demonstrates Caseslorente's exercise of decision-making authority, his leading participation in planning the offense, and his control over the nature and scope of the offense.

other criminally culpable individual.[6]  *See Farrington*, 1998 WL 415992; *United States v. Martinez*, 181 F.3d 794 (6th Cir. 1999).

Although Caseslorente is correct that the *Paulino* standard no longer applies to § 3B1.1(c) sentence enhancement, there is no evidence that the district court relied on *Paulino* in determining that the enhancement of Caseslorente's sentence was justified.[7]  Even if such proof were available, however, there is sufficient evidence in the record to justify the court's conclusion that Caseslorente was a leader, organizer, manager or supervisor under § 3B1.1(c).  The evidence shows that Caseslorente directed Robinson to find another name to whom checks could be addressed, and that he directed Robinson to obtain a money order with which to bribe a suspicious employee of a vendor.  Further, Robinson asked Caseslorente for permission to leave the conspiracy and Caseslorente refused to allow Robinson to do so.  Although it is preferable for trial courts to state on the record the specific facts relied upon in awarding a § 3B1.1 enhancement, it is not required.  *See Farrington*, 1998 WL 415992 at *3; *Alexander*, 59 F.3d at 39.

Moreover, the district court's findings were sufficient to support a § 3B1.1(c) enhancement.  It is clear that the court

---

[6]*Clay* is not the only case to slightly misstate the holding of *Gort-DiDonato*.  Another panel of this Circuit recently held that "where a defendant exercises control over another participant, sentence enhancement is required, while evidence that a defendant exercised control over property, assets or activities merely permits sentence enhancement." *United States v. Layne*, 192 F.3d 556, 579 (6th Cir. 1999). In fact, *Gort-DiDonato* holds that an upward departure - not a sentence enhancement - may be warranted where a defendant exercises control only over property or activities.  To enhance a sentence under §3B1.1(c), a district court must find that a defendant has exercised control over another person.

[7]The issue of enhancement was argued orally at the end of trial, on briefs after the trial, and at an oral sentencing hearing where evidence was presented.

Mobile, Alabama at the request of someone identifying himself as Caseslorente.  A driver for Weyerhauser Paper Company testified to transporting paper from the Recycling Center to a place near a Weyerhauser mill in Oklahoma, without receiving a bill of lading for the shipment.  Evidence shows that Caseslorente sometimes used the inmates assigned to work at the Center to load and strap down the stolen goods just as he used them to load regular shipments.

The Navy opened an investigation of this activity in June 1996 after receiving information from one of the government's vendors about questionable billing practices at the Center.  On April 30, 1997, a grand jury returned a thirteen-count indictment charging Caseslorente with theft of government property, conspiracy to steal government property, interstate transportation of stolen goods, and mail fraud.  One count was subsequently dismissed by the district court, and Caseslorente pled 'not guilty' to the remaining twelve counts.

A jury trial began on June 1, 1998.  Three days later, the jury returned a verdict of guilty on all counts.  The Probation Office subsequently prepared a Presentence Investigation Report recommending, under U.S.S.G. § 3B1.1(c), that Caseslorente's sentence be enhanced by two levels based on his role as a "leader, organizer, manager, or supervisor" of the criminal activity.  Caseslorente objected to the proposed enhancement.  The Probation Office thereafter filed an addendum to the Report supporting its position.

On August 21, 1998, a sentencing hearing was held during which Caseslorente reiterated his objection to the § 3B1.1(c) enhancement.  After presentation of evidence, the district court concluded:

Because of Mr. Robinson's involvement in this matter and his prior participation, I find this question a little closer than I might otherwise.  Mr. Robinson was no angel himself.  There is evidence that the defendant points out that perhaps he was not being led, but there is other evidence in this record that the government just

referred to, that when, taken as a whole convinces me that the two point adjustment upward . . . is the appropriate . . . I think the balance of the evidence - I know the balance of the evidence leads me to conclude that the Chief was an organizer, a leader, a supervisor, a prime personality in this crime.

*Sentencing Hearing, Joint Appendix, p. 237.* The court sentenced Caseslorente to 18 months of imprisonment followed by two years of supervised release. On August 26, 1998, the district court entered its judgment and sentence.

Caseslorente contends on appeal that, while the prosecution proved that he stole the property, there was insufficient evidence to support a finding that the stolen property belonged to the government, a required element of 18 U.S.C. § 641. He also challenges the district court's two-level enhancement of his sentence under § 3B1.1(c) on the basis that it was inappropriate in this case and not supported by the requisite factual findings.

## II.

When a conviction is attacked for insufficiency of evidence, the appellate court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Blakeney*, 942 F.2d, 1001, 1010 (6th Cir.1991), *quoting Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319.

*Farrington*, 1998 WL 415992 at *2. Even though the district court did not make the specific finding that Farrington had supervised Parker, this court affirmed the enhancement because "a reasonable reading of the district court's discussion of the evidence on this issue permitt[ed] the conclusion that [the defendant] exercised control over [a participant]." *Farrington*, 1998 WL 415992 at *3.

Here, Caseslorente contends that his sentence enhancement was inappropriate because the government incorrectly cited the 1991 standard enunciated in *Paulino* as the applicable standard for § 3B1.1(c) review. He claims that the district court relied on this incorrect legal standard in concluding that enhancement was appropriate, and that there was no evidence that he exercised any control over his co-conspirator, Robinson. Alternatively, Caseslorente argues that the district court did not make findings of fact sufficient to warrant application of the enhancement. At the very least, argues Caseslorente, this vague conclusion should be remanded for additional findings before the § 3B1.1(c) enhancement is upheld.

The government argues that the *Paulino* standard (requiring only a showing that a defendant supervised criminal activity as opposed to a person) still applies because it was cited approvingly in *United States v. Clay*, 117 F.3d 317, 321 (6th Cir. 1997). However, *Gort-DiDonato* is the governing law of this Circuit. To the extent that the *Clay* court did not follow the holding of *Gort-DiDonato*, the contrary portion of the holding in *Clay* does not have precedential effect. As we stated in *Salmi v. Secretary of Health & Human Services*, 774 F.2d 685 (6th Cir. 1985), "[a] panel of this court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification or this Court sitting en banc overrules the prior decision." The Sixth Circuit has determined several times that sentence enhancement under § 3B1.1(c) requires a showing that the defendant led, organized, managed, or supervised at least one

*Gort-DiDonato*, 109 F.3d at 321 (citations omitted). In *Gort-DiDonato*, the district court enhanced a criminal defendant's sentence under § 3B1.1(c) without making a finding that the defendant had supervised at least one person. Because the district court had enhanced the sentence (as opposed to departing upward), this court found that it was incumbent upon the district court to make a factual finding that the defendant had supervised, managed, led or organized another participant in the criminal scheme to justify the enhancement.

Since the *Gort-DiDonato* decision was issued, this court has reviewed other § 3B1.1(c) sentence enhancements imposed without explicit factual findings and concluded, nonetheless, that enhancement was warranted. In *United States v. Farrington*, No. 97-3515, 1998 WL 415992 (6th Cir. July 6, 1998), for example, a defendant who pled guilty to mail fraud appealed his § 3B1.1(c) sentence enhancement on the basis that the district court's findings related only to his control over the criminal activity and not to his control over another participant. In deciding that enhancement was warranted, the district court stated:

> It was Mr. Farrington that had acquired all of the counterfeit, all of these counterfeit checks, had set up the bank accounts and was involved in the scheme of this fraudulent activity when Parker came along. And through Farrington's efforts, Parker – he was issued some of the checks, but they were checks that have been acquired by Farrington. And it seems to me under the facts we have that it is clear that Farrington was supervising – was organizing. Not only did he organize it, but he was supervising it in that he used some of the checks to make them payable to Parker . . .
> From the totality of the evidence in this case, the Court finds that the Defendant was the organizer of the criminal activity in this action, in that he devised, organized and implemented the fraudulent scheme. He gave counterfeit checks to his Co-Defendant to cash, and without his contacts, planning and operation, the scheme would not have been implemented.

Caseslorente maintains that the government did not "own" the baled recyclables he stole; rather, the government had only a security interest in them until the vendors' checks were cashed by the government.[3] Because he cashed the checks before delivering them to the government, he cannot properly be convicted under 18 U.S.C. § 641 for theft of "government" property. According to Caseslorente, the government did not own the baled recyclables he sold to the government's vendors because the government did not buy the recyclable material. Caseslorente further contends that the Recycling Center was not a true government entity, because it was funded by the government only indirectly through the assignment of paid Naval personnel who worked there, because prisoners also worked there, and because the head of the Navy's MWR Department was a civilian. In support of this theory, Caseslorente cites *United States v. Klingler*, 61 F.3d 1234, 1238 (6th Cir. 1995). A careful reading of this case, however, reveals that it does not support Caseslorente's argument.

Klingler was a customs broker licensed by the U.S. Customs Service to facilitate entry of imported goods into this country. The Customs Service detains imported goods when they arrive at U.S. ports until customs duties, fees and taxes are paid by the importers. When the goods arrive at the ports, an entry summary must be filed, describing the imports and estimating the amounts owed the government. Klingler was hired by the importers to file such summaries and forward their payments to the government. However, she converted some of their money to personal use before delivering it to the government. Klingler was thereafter convicted of theft of government monies under 18 U.S.C. § 641. Section 641 criminalizes the conduct of anyone who:

> embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells,

---

[3] When the panel pressed Caseslorente's position to its logical conclusion at oral argument, counsel maintained that the government did not even have an interest in the proceeds.

conveys or disposes of any record, voucher, money or thing of value to the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . .

18 U.S.C. § 641.

In *Klingler*, this court held that federal ownership of the property in question is a prerequisite to federal jurisdiction under § 641. *Klingler*, 61 F.3d at 1236, *citing United States v. Baker*, 693 F.2d 183, 186 (D.C. Cir. 1982). The court listed four types of situations where stolen property belongs to the government. First, where the stolen property clearly belongs to the government. Second, where the federal government or one of its agents acts as a custodian or bailee of property, so that the transitory possession makes the property "of the United States." Third, where property or funds that came from the federal government are now in private hands, but the government has retained sufficient control so that they remain government property. Fourth, where a government employee or agent has received property but failed to convey it to the United States, so that the question is whether it has attained the status of government property. *Klingler*, 61 F.3d at 1238.

The court agreed with Klingler's position that the district court lacked subject matter jurisdiction over her case because the funds that Klingler converted belonged to her clients, not the United States.[4] That the funds were earmarked for the government was not enough. Klingler was not a government agent; thus, the funds she received from her clients and converted to personal use never became property of the

---

[4] Before entering a plea agreement with the government, Klingler had filed a motion to dismiss the indictment based on lack of subject matter jurisdiction. The district court denied that motion. *See United States v. Klingler*, 827 F. Supp. 1287 (E.D. Mich. 1993). The conditional plea agreement she later signed allowed her to appeal the district court's denial of that motion. *United States v. Klingler*, 61 F.3d at 1236.

enhancement under § 3B1.1. *See, e.g., United States v. Fuentes*, 954 F.2d 151 (3d Cir. 1992); *United States v. Fuller*, 897 F.2d 1217 (1st Cir. 1990). Others held that it was sufficient to show merely that a defendant exercised some measure of leadership over the criminal activity. *United States v. Chambers*, 985 F.2d 1263 (7th Cir. 1995). The Sixth Circuit fell into the second group. At the time, all this court required for § 3B1.1 sentence enhancement was participation of at least two culpable persons "so that leadership of some criminal enterprise or organization, however minimal, could be claimed." *United States v. Paulino*, 935 F.2d 739, 757 (6th Cir. 1991). *See also United States v. Bashara*, 27 F.3d 1174 (6th Cir. 1994) and *United States v. Alexander*, 59 F.3d 36 (6th Cir. 1995).

In November 1993, Application Note 2 of the commentary to § 3B1.1 was amended to clarify the intended reach of § 3B1.1. It now provides:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

§ 3B1.1, comment. (n.2) (emphasis added).

In a subsequent decision, *United States v. Gort-DiDonato*, 109 F.3d 318 (6th Cir. 1997), this court interpreted the amended note as follows:

> Where the defendant exerts control over at least one participant in a supervisory, managerial, leadership, or organizational capacity, a sentence enhancement is required under § 3B1.1. Whereas, where a defendant does not exercise control over an individual but over property, assets, or activities, an upward departure may be warranted.

the property that Caseslorente stole was owned by the government.

### III.

Caseslorente also challenges the district court's application of a two-level sentence enhancement under Section 3B1.1(c) of the United States Sentencing Guidelines for his role in the offenses he committed. Determination of a defendant's role in an offense is a factual inquiry reviewed on appeal for clear error. *United States v. Akrawi*, 982 F.2d 970, 974 (6th Cir. 1993). Where the district court fails to articulate the reasons for the enhancement, a *de novo* review is necessary to "determine whether the enhancement is applicable, or whether remand for further findings is required." *United States v. Vandeberg*, 201 F.3d 805, 811 n.2 (6th Cir. 2000). Legal conclusions as to the application of the Sentencing Guidelines are reviewed *de novo*. *See United States v. Clay*, 117 F.3d 317, 320 (6th Cir. 1997). Section 3B1.1(c) of the United States Sentencing Guidelines provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a)  If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c)  If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Prior to November 1993, the circuit courts differed as to the interpretation of this provision. Some circuits held that it was necessary to show that a defendant exercised control over at least one participant in a criminal scheme to justify sentence

government. The court analogized *Klingler* to several cases in which private individuals converted private funds intended for the government to personal use before they ever reached the government. *See*, *e.g.*, *United States v. Reed*, 851 F. Supp. 1296 (W.D. Ark. 1994), *aff'd*, 47 F.3d 288 (8th Cir. 1995) (attorney who stole money from a trust account that was intended to pay a client's income taxes stole his client's funds); *United States v. Morris*, 541 F.2d 153, 154 (6th Cir. 1976) (director of government-funded school lunch program who converted a private day care center's check written to the program stole the day care center's funds); *United States v. Collins*, 464 F.2d 1163 (6th Cir. 1972) (defendant who falsely endorsed a city's warrant for funds related to a federal program stole the bank's funds). The conclusion common to these cases was that private funds converted to personal use by private individuals are not government property even though intended to be paid to the government.[5]

Caseslorente attempts to analogize his case to *Klingler*. Because he claims the government did not own the recyclables, his argument focuses (like *Klingler*) on the vendors' checks. He asserts that this appeal deals only with the fourth *Klingler* category; i.e., where a government employee has received property but failed to convey it to the United States and the only question is whether it has attained the status of government property.

The instant case is distinguishable from *Klingler*. Klingler was a private individual who was hired by importers to represent their private interests. She converted their money to personal use before turning it over to the government. She was not an agent of the government. The only connection she had to the government was a license issued to her by the Customs Service that permitted her to function as a customs broker.

---

[5] In *Collins*, this court also concluded that it was an essential element of a §641 case that the government have suffered an actual property loss. 464 F.2d at 1165.

Caseslorente, on the other hand, was a salaried government employee whose job it was to manage the Navy's recycling program. In this respect, the instant case is more akin to *United States v. Benefield*, 721 F.2d 128 (4th Cir. 1983), a case cited approvingly by this court in *Klingler*. *See Klingler*, 61 F.3d at 1238-239. In *Benefield*, a cashier at an NCO Club who was making arrangements for a private party told the client to make out four blank checks. She inserted her own name on the check that was intended to pay the staff's gratuities, and cashed it. The *Klingler* court, in explaining the *Benefield* decision, found that the stolen tips could properly be considered government property under the *second Klingler* category because the defendant "was a federal employee who acted as an agent for the government, thereby demonstrating constructive possession of the funds." *Klingler*, 61 F.3d at 1239. Here, Caseslorente was a federal employee acting as an agent of the government when he cashed the vendors' checks. Thus, focusing solely on the vendors' checks, this case appears to fall under the second *Klingler* category (constructive possession by a government employee of funds intended for the government) rather than the fourth category, as argued by Caseslorente.

Moreover, one need not venture as far as the second *Klingler* category to see where this case fits, because the evidence shows that the recyclables Caseslorente stole clearly belonged to the government under the first category. *Klingler*, 61 F.3d at 1238. Although the Navy did not purchase the recyclables, they were specifically set aside for the Navy's use. They were picked up and processed on the base by salaried Naval personnel, all at government expense. The recyclable material had a monetary value. It was secured in a fenced, padlocked compound on the base and sold to government vendors for a profit. All proceeds went to a department of the Navy and the funds were used to benefit servicemen and their dependents.

This Circuit has previously affirmed a conviction under § 641 for theft of government property where the material stolen was scrap metal removed from a military installation.

*See United States v. Bess*, 593 F.2d 749, 751 (6th Cir. 1979). The defendant in that case was a private individual who contended that the scrap (shells and debris from old military vehicles used for target practice) that he removed from the base had been abandoned by the government. The court upheld the conviction, despite evidence that the scrap had indeed been abandoned, noting that the metal had a monetary value, it was located on government property, and the defendant's request to obtain a contract to haul away the metal had been denied. *Id.,* 593 F.2d at 752.

The Ninth Circuit has required that the government show it had "title to, possession of or control over" stolen material in order to prove that it is owned by the government under § 641. *United States v. Tailan*, 161 F.3d 591, 592 (9th Cir. 1998), *quoting United States v. Long*, 706 F.2d 1044, 1049 (9th Cir. 1983). To satisfy that burden in *Tailan*, the government provided evidence that the stolen property was kept in a storage trailer secured by a padlock, on a fenced military installation. The government also showed that it had planned to sell the stolen property. *Id.* at 593.

The facts of this case are more analogous to *Bess* and *Tailan* than *Klingler*. Like *Bess*, the stolen property in this case had monetary value and was located on government property. The instant case is even more compelling because there is no evidence that the Navy abandoned the recyclables that it collected, processed and sold for its own benefit. Furthermore, the Navy had a contract with the city to pick up its recyclables and *keep any revenue derived therefrom*. As in *Tailan*, the prosecution in this case showed that the Navy exercised every indicia of ownership over the stolen property; among other things, it maintained the property behind a padlocked 15-foot-high fence in a facility located on the Naval Base.

In short, whether one focuses on the recyclables or the vendors' checks, there is sufficient direct and circumstantial evidence upon which a rational factfinder could conclude that