NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0785n.06

No. 09-1728

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 22, 2010**

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| DONALD NORTON YORK, | ) COURT FOR THE EASTERN |
| | ) DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) |
| | ) O P I N I O N |
| | ) |
| | ) |

BEFORE: BOGGS and McKEAGUE, Circuit Judges; and QUIST, Senior District Judge.[*]

**McKeague, Circuit Judge.** Donald Norton York pled guilty to one count of conspiracy to

distribute and possess with intent to distribute fifty or more grams of methamphetamine, in violation

of 21 U.S.C. §§ 841(a)(1) and 846. After his plea was accepted but prior to being sentenced, York

filed a pro se motion to withdraw his guilty plea and a motion to have his attorney withdraw as

counsel of record. The district court granted the motion to have York's counsel withdraw but denied

the motion to withdraw the plea. On appeal, York argues that the district court abused its discretion

when it used "clearly erroneous" facts and failed to give proper weight to certain factors when ruling

on York's motion to withdraw his plea. Because the district court engaged in a comprehensive

---

[*]The Honorable Gordon J. Quist, United States Senior District Judge for the Western District
of Michigan, sitting by designation.

balancing of the relevant factors, we find that there was no abuse of discretion in denying York's

motion. Accordingly, we AFFIRM the district court's denial of York's motion to withdraw his plea.

## I. BACKGROUND

York was a member of the Flint chapter of the Flying Wheels Motorcycle Club, a motorcycle

gang that was being investigated by the Federal Bureau of Investigation and state law enforcement

for trafficking in methamphetamine. During the investigation, a confidential informant revealed that

York was involved in the sale of methamphetamine and the murder of another gang member who

had been cooperating with law enforcement. The informant explained that York and another

individual had been recruited to kill this gang member to prevent him from revealing more

information about the drug-trafficking operation. The informant also provided information on how

the murder took place and made several controlled purchases of methamphetamine from York.

On August 11, 2004, York was charged in an indictment with one count of conspiracy to

distribute and to possess with intent to distribute 500 grams or more of methamphetamine and one

count of distribution of fifty grams or less of methamphetamine. A year-and-a-half later, in the sixth

and final superseding indictment, York was charged with the original counts, as well as an additional

count of distribution of fifty grams or less of methamphetamine, two counts of possession of a

firearm by an unlawful user of a controlled substance, sale or disposition of a firearm to a felon,

possession of a firearm with an obliterated serial number, conspiracy to murder and murder of an

individual while engaging in a conspiracy to possess with intent to distribute methamphetamine, use

of a firearm during a drug trafficking crime, and witness tampering.

On October 3, 2007, York was scheduled to appear for trial in the district court. Instead, York changed his plea to guilty to the lesser included offense of one count of conspiracy to distribute fifty grams or more of methamphetamine, and the Government agreed to drop all remaining charges. The plea agreement stipulated that York was accountable for between five and fifteen kilograms of methamphetamine, resulting in an offense level of thirty-six under U.S. Sentencing Guidelines Manual § 2D1.1(c)(2) ("U.S.S.G."); that a two-level increase was appropriate because York knew that the methamphetamine was unlawfully imported; and that while the plea agreement recommended a two-level reduction for acceptance of responsibility, the recommendation could change if the Government learned of information inconsistent with the adjustment after the plea was entered but prior to sentencing. On the basis of those stipulations, the plea agreement determined that York's Guidelines range of imprisonment would be 188–235 months, as explained in worksheets accompanying the plea agreement. However, the agreement also stated that both parties agreed to an adjusted range if the court found that York's criminal history was higher than calculated or that York's offense level was higher due to York making false statements, withholding information, demonstrating a lack of acceptance of responsibility, or obstructing justice prior to sentencing.

At the plea hearing, conducted pursuant to Rule 11 of the Federal Rules of Criminal Procedure, York was sworn before the court and acknowledged that he was obligated to tell the truth and could be prosecuted for perjury if he failed to do so. When asked by the court whether he "ever had any emotional problems or mental health issues that could have an effect on [his] ability to think and use good judgment" at his plea hearing, York responded that he had not. David Nickola, York's

trial counsel, also stated that York was "capable of entering a knowing plea." After the Government recited the terms of the plea agreement in open court, York informed the court that he had heard all of the terms and that it was consistent with his understanding of the agreement. He also confirmed that he had not been promised anything, apart from the provisions of the agreement, to convince him to enter his plea. York admitted that he was entering his plea because he was responsible for the conduct of the charged offense, and he expressly stated that he illegally used methamphetamine and also sold at least fifty grams to his friends to support his drug habit. After concluding that York was competent to enter his plea, that he had done so "freely and voluntarily" in a "knowing and intelligent way," and that a factual basis existed for the plea, the court accepted the plea agreement and ordered that a date be set for the sentencing hearing.

Prior to the sentencing hearing, a PSR was completed that established a Guidelines range of 188–235 months, corresponding with the stipulations in the plea agreement, and noted the five-year statutory mandatory minimum. York's counsel filed a sentencing memorandum requesting a sentence below the five-year mandatory minimum, pursuant to the "safety valve" provision in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, and placement in a residential substance abuse treatment program. However, four days later, on January 15, 2008 (and more than three months after accepting the plea agreement), York filed a pro se motion to withdraw his guilty plea and a motion to have his attorney withdraw. In both motions, York argued that his counsel was ineffective, that his plea was not knowing and voluntary because counsel told York that he would serve only five years in prison, and that York based his acceptance of the plea on that belief. Nickola consented to his own removal,

but denied all allegations of ineffective assistance. The district court granted the motion to withdraw Nickola and set a hearing on York's motion to withdraw his guilty plea.

The court heard two days of testimony from York, York's wife, and Nickola on York's motion to withdraw his guilty plea. York testified that on the day he was scheduled to go to trial, Nickola came to him in the holding cell and informed York that he had gotten a "real good offer." Nickola informed York that because of his age, his lack of a criminal record, and his wife's disability, the judge agreed to give York a five-year sentence if York "would say what he wanted me to say in this plea." After informing York of the plea, Nickola left to speak with York's wife about the deal. York's wife testified that she spoke with Nickola at the courthouse, who informed her that York would receive a sentence of five years. When Nickola returned to the holding cell, he gave York four pages of the agreement, excluding the worksheets calculating his Guidelines range, and told him that he had to sign it immediately if he wanted the offer. York signed the agreement, and testified that he did so, despite still professing his innocence, because he wanted to be able to take care of his wife. Although he acknowledged that the district judge read into the record the established Guidelines range of 188–235 months at his plea hearing, York also stated that because the judge mentioned the applicable statutory mandatory minimum of five years, he believed that was the sentence he would get pursuant to the agreement brought to him by Nickola.

According to York, after the PSR was drafted, Nickola went through the PSR with York, who questioned why the report was needed if there was an existing agreement providing for a five-year sentence. Nickola allegedly told York that the judge did not say York would get five years, but that Nickola would argue for a sentence of five years and if it was not granted, Nickola would "pull

[York's] plea under the Rule 11" and they would go to trial. Some time after this meeting, York made repeated calls to Nickola because he believed there was "something fishy" about his plea after speaking with individuals in his cell block who had informed York that their plea agreements were longer than four pages. When York finally spoke with Nickola, he informed Nickola that he wanted to withdraw his plea. Nickola told York that he could not withdraw the plea, and said that he would file an appeal only if the court sentenced York to more than twenty years. York then filed the pro se motion to withdraw the plea, testifying that he waited as long as he did to file the motion, despite his initial suspicions about the agreement, because he was "ignorant" and had to file it himself. York also told the court that he suffers from post-traumatic stress disorder ("PTSD"), which causes him to make bad decisions and impacts his memory.

On cross-examination, the Government asked York whether he testified truthfully at his Rule 11 hearing, and York stated that he did not. York also stated that he was not paying attention when the court told him that the offense to which he was pleading guilty carried a forty-year maximum sentence, and that he "blocked everything out except hearing the five years" that he thought he was going to receive. When asked why he did not raise any questions in response to the Government's recitation of the terms of the agreement, York explained that Nickola told him that he had to respond the way the judge wanted him to, so York tried to "go along with whatever [the district judge] said."

Nickola also testified at the hearing, contradicting York's recollection of events regarding the plea agreement and his subsequent communications with York. Nickola recounted that the Government had originally offered York a plea with a cap of 300 months, which required him to plead guilty to murder in the course of drug trafficking, but York refused the offer. Upon receiving

the new offer from the Government, Nickola explained to York that the proposed agreement contemplated a sentencing range of 188–235 months of imprisonment, but that it dropped all weapons and homicide charges, which York believed would have prevented resolution of the case had they remained in the agreement. Nickola informed York that he believed this was "the best deal" he could get, and York agreed to accept the plea. After indicating York's acceptance to the Government, Nickola spoke with York about the forthcoming sentencing, including the discretionary nature of the Sentencing Guidelines, the ability to seek a sentence below the Guidelines range, and the factors that Nickola believed would support a request for a below-Guidelines sentence.

According to Nickola, once the Government drafted the written plea agreement, he brought the entire agreement, including the Guidelines calculations worksheets, to York for his review. Nickola went over the agreement page by page for approximately thirty minutes to make sure York understood all of the provisions contained therein, and that by signing the plea agreement he was obligating himself to adhere to that agreement. Nickola also explained to York that he would have to disclose the truth of his involvement in his own words; that a PSR would need to be drafted and that York could file objections to it; and that a sentencing memorandum would be filed by Nickola, highlighting the things that York and Nickola wanted to present to the judge for consideration during sentencing. According to Nickola, while discussing the plea agreement with him, York never exhibited any problems interacting with Nickola, was not disoriented, and did not appear to be confused or to misunderstand any of the discussion. Nickola testified that he spoke with York's wife that day, informed her that the Government had offered York a plea deal, and explained the general Guidelines range and his hope that he could obtain a below-Guidelines sentence for York.

Approximately a week after the plea hearing, Nickola met with York for the presentence-investigation interview. York raised no concerns regarding the plea agreement, either to York or to the probation officer conducting the interview. Once the PSR was completed in December 2007, Nickola met with York to review the report. York indicated that he was familiar with the process, having discussed presentence reports with some of his co-defendants who had pled and already been sentenced, and he asked Nickola to put in specific objections to his PSR that he believed would result in better treatment while incarcerated. Nickola also reviewed the first draft of the sentencing memorandum with York and left a copy for him to review for accuracy. York sent a letter to Nickola noting proposed changes to the memorandum, and Nickola met again with York in early January 2008 to present York with a third draft incorporating those changes. According to Nickola, this was the first time that York expressed a desire to withdraw his guilty plea, doing so only after Nickola informed York that the original prosecutor on the case had been replaced. York told Nickola that he believed they could beat the new prosecutor at trial, but Nickola informed York that a change in prosecutor was not a basis on which York could withdraw his plea, and stated that he would not file the motion to withdraw. When Nickola visited York again shortly after that meeting to present him with a finalized version of the sentencing memorandum, York again raised the issue of withdrawal, although Nickola talked only about the upcoming sentencing hearing. Nickola testified that, until he was contacted regarding York's pro se filing of the motion to withdraw the plea, he and York had not discussed nor had he otherwise been made aware of any of the allegations raised by York in that motion.

After hearing the testimony, the district court engaged in an assessment and balancing of the factors articulated by this court in *United States v. Dixon*, 479 F.3d 431 (6th Cir. 2007), to determine whether to grant York's motion to withdraw. The court noted that York's "nature and background" weighed in his favor, as did "the degree to which he has had prior experience with the criminal justice system." Specifically, the court stated that York had "never been in a hearing where he was tendering a guilty plea to the court," and that he had been a "hard working man throughout the course of most of his life with little contact or no contact with the criminal justice system."

However, the court also noted the context in which the case arose, specifically that the Department of Justice was possibly seeking the death penalty for York and that other defendants had pled guilty and received sentences exceeding York's established Guidelines range. As a result, York "at least understood the context and the gravity of the offense." The court determined that these additional factors weighed "much stronger against the granting of the motion." The court also explained that there was nothing in the Rule 11 agreement "that would have in any way misguided the defendant," nor was anything said during the hearing or by York himself that suggested he had a misunderstanding of the terms of the agreement. The court observed that the Guidelines range was less than but not inconsistent with the ranges established for York's co-defendants, and that there was "no pressure" to agree to the plea since the jury had not been empaneled.

With regard to the filing of York's motion, the court explained that there was a "good deal of time" between October 9, when York alleged he was first made aware that his sentence would not be governed by the statutory minimum, and January 15, when York filed his motion to withdraw. The court noted that throughout this time, there were multiple documents referencing the Guidelines

range, and York's assertion that he was "shocked" to learn his case would be governed by that range was "simply not credible." Further, while York had consistently denied involvement in the murder, he had admitted his participation in the distribution of methamphetamine and in aiding and abetting others in doing so. Finally, the court stated that granting the motion would result in prejudice to the government because the events underlying the case had been ongoing since 1995, some evidence in the case was currently being disposed of, and some of the witnesses for both the government and York had been dispersed. Accordingly, the court determined that there were "no fair justifications" for York's withdraw of his plea, and it denied the motion.

At the sentencing hearing, the court determined that as a result of his testimony at the hearing on the motion to withdraw, York was no longer entitled to a two-level reduction for acceptance of responsibility, making his total offense level thirty-eight. With a criminal history category of I, York's Guidelines range of imprisonment increased to 235–293 months. The district court sentenced York to 245 months in prison, and York timely appealed.

## II. ANALYSIS

On appeal, York challenges the district court's denial of his motion to withdraw his guilty plea. Where a defendant has voluntarily entered a guilty plea but seeks to have it withdrawn before his sentence is imposed, Federal Rule of Criminal Procedure 11(d)(2)(B) permits withdrawal only where the defendant "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B); *see also United States v. Pluta*, 144 F.3d 968, 973 (6th Cir. 1998) (explaining that the defendant bears the burden of proving the existence of a "fair and just reason" for withdrawal). "We review the district court's denial of a motion to withdraw a guilty plea for abuse of discretion."

*Dixon*, 479 F.3d at 436. "A district court abuses its discretion where it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008) (internal quotation marks omitted).

This circuit has established that when deciding on a motion to withdraw a guilty plea, district courts should consider the following factors:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Id.* (quoting *United States v. Bashara,* 27 F.3d 1174, 1181 (6th Cir. 1994), *superseded on other grounds as recognized in United States v. Caseslorente,* 220 F.3d 727, 734 (6th Cir. 2000)). The list is "general and nonexclusive," and no one factor is determinative. *Id.* Instead, "the district court must review all the circumstances surrounding the original entrance of the plea as well as the motion to withdraw." *United States v. Triplett*, 828 F.2d 1195, 1197 (6th Cir. 1987). In weighing these factors, the court should be mindful "that the aim of the rule is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'" *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991) (quoting *United States v. Carr,* 740 F.2d 339, 345 (5th Cir. 1984)).

Here, York argues that although the court "cited to the proper factors" in ruling on the motion

to withdraw his guilty plea, the court "abused its discretion when it used clearly erroneous facts in

finding that York's motion should be denied" and failed to consider the entire record. Specifically,

York argues that the court should have given "proper weight" to York's "complete lack of

experience in the criminal justice field," alleges that the court failed to consider his PTSD, and

challenges the court's credibility determinations. York states that he consistently maintained his

innocence for four years and, considering the above-listed factors, the district court should have

granted his motion to withdraw his guilty plea.

Despite York's many challenges to the district court's analysis, it cannot be said that the court

abused its discretion in denying York's motion to withdraw his guilty plea. First, the amount of time

that elapsed between when York entered his guilty plea and when he filed the motion to withdraw

was excessive. York entered his plea on October 3, 2007, and was interviewed by a probation officer

for completion of the PSR approximately a week later. York testified that it was at this interview

that he first realized that he would not be guaranteed the five-year mandatory-minimum sentence.

However, as the district court noted when ruling on York's motion, York waited until January 15,

2008, more than three months later, to file his motion to withdraw his guilty plea. York does not

dispute this fact on appeal, arguing only that he tried to call Nickola many times in the month after

discovering this fact so that Nickola could file the motion to withdraw, but that his calls were not

accepted. Even accepting York's contention that he immediately tried to contact Nickola to file the

motion and that Nickola denied his request in early November, York still fails to explain why he

waited another two months before filing his pro se motion, which is almost exactly the amount of time that this court has already determined is an "extensive delay." *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) ("The strongest factors supporting the district court's ruling are the sixty-seven day delay between the motion and the plea, and Baez's failure to justify this extensive delay."); *see also United States v. Durham*, 178 F.3d 796, 798–99 (6th Cir. 1999) (noting that the "[t]he strongest factor supporting the district court's denial of Durham's motion is the length of time between Durham's plea and the filing of his motion to withdraw," which was approximately seventy-seven days); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (citing a "lengthy 55-day delay" in upholding the denial of defendant's motion to withdraw); *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (affirming the court's denial of defendant's motion, which was filed five weeks after entry of his guilty plea). Moreover, the district court found that York's testimony regarding when he became aware that the Guidelines range rather the statutory minimum would apply to his sentence was not credible, a determination that is not clearly erroneous in light of the testimony at the hearing. *See Dixon*, 479 F.3d at 435–36 (noting that findings of fact based on a credibility determination are not typically subject to reversal on appellate review).

Next, although York correctly notes that he has consistently maintained his innocence with regard to the murder charge, he admitted at the plea hearing that he was guilty of the charged offense of conspiracy to distribute methamphetamine, and he does now not assert that he is innocent of that charge. *See Baez*, 87 F.3d at 809 (noting that defendant admitted his guilt at the plea hearing and did not reassert his innocence until the day of sentencing). Moreover, the court found the following circumstances underlying entry of the guilty plea: a plea agreement had been offered to York before

a jury had been empaneled; the plea agreement dropped the most serious charges involving murder and included only the lesser-included offense of conspiracy to distribute fifty or more grams of methamphetamine; Nickola explained to York that if he accepted the plea, he would be facing a Guidelines range of 188–235 months in prison, but that York could ask the court for a lower sentence; York's co-defendants had been sentenced on similar or related charges and had received sentences greater than the high end of York's Guidelines range; York never expressed any confusion over the terms of his plea agreement and there was no indication in his interactions with Nickola that he was affected by his PTSD when deciding whether to accept the plea; no statements made by Nickola before the plea hearing, and no statements made by Nickola, the court, or the Government at the plea hearing suggested that York would be guaranteed a sentence of five years; and there was no pressure to accept the plea, either from Nickola or the court.

As the district court noted, and York correctly asserts in his brief, York had no prior experience with the criminal justice system, and his background demonstrates that he was generally a hardworking man and veteran who remained law-abiding for much of his life. Yet these factors are the only ones that weigh in York's favor. Not only did York wait an excessive amount of time and fail to present a valid reason for the delay in filing his motion, but had the district court granted his motion, prejudice would have resulted. Motions had been granted to destroy key evidence in the case, many years had passed since the indictment had originally been filed, and co-defendants were imprisoned and had been moved to other locations. Weighing all of these factors, it cannot be said that the district court abused its discretion in denying York's motion to withdraw his guilty plea.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of York's motion to withdraw his guilty plea.