*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 06-4583

SHAWN JOSEPH MILLER,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00166—Donald C. Nugent, District Judge.

Argued: April 30, 2008

Decided and Filed: July 1, 2008

Before: NORRIS, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Justin J. Roberts, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Justin J. Roberts, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

GRIFFIN, Circuit Judge. Following a jury trial, defendant Shawn Joseph Miller was found guilty on two counts of committing wire fraud, in violation of 18 U.S.C. § 1343, two counts of money laundering, in violation of 18 U.S.C. § 1957, and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3). Thereafter, the district court sentenced Miller to an above-Guidelines term of 125 months of imprisonment.

Miller now appeals, raising four claims: (1) his constitutional right to a fair trial was abridged when he was forced to wear an electronic stun belt during trial; (2) the district court erred in failing to sua sponte order a mental competency hearing; (3) the evidence offered against him at trial was insufficient to support the jury's finding of guilt on the witness tampering charge; and (4) his sentence was substantively unreasonable. For the reasons set forth below, we affirm Miller's convictions and order a limited remand for resentencing for the purpose of correcting Miller's term of supervised release.

1

I.

Miller operated two Ohio corporations, McClure, Becker & Associates, Inc. and McClure, Becker & Ramono Financial, Inc. (collectively "McClure Becker"), that purported to be engaged in the business of purchasing and selling credit card debt portfolios to brokers and collection agencies. In conducting this business, McClure Becker maintained a checking account with First Merit Bank in Sheffield, Ohio. Miller was a signatory on the account.

Between September 2002 and December 2003, Miller used McClure Becker to defraud others by selling non-existent and fraudulent debt portfolios. Miller offered for sale to debt brokers and collection agencies what purported to be credit card portfolios of consumer debtor accounts. These portfolios were later revealed to be fraudulent, as the supposed debtors did not have debt with the credit card companies, did not live where stated in the portfolio, or Miller did not own the portfolios that he sold.

After receiving wire transfer payments in exchange for the sale of the fraudulent portfolios, Miller converted the funds into cash and cashier's checks through the First Merit account. Miller then mostly used these funds for personal use, including gambling vacations to Las Vegas and Windsor, Ontario. However, when confronted with the fraudulent nature of his portfolios by clients, Miller occasionally used the proceeds in a manner consistent with a "ponzi scheme," applying funds received from subsequent brokers to pay off previous clients.

The FBI began investigating Miller in April 2004. Miller apparently learned of the investigation and, in July 2005, met with Sherry Lynn Rains, an employee of First Merit Bank who opened McClure Becker's account with the bank.[1] Miller warned Rains that if she talked to anyone about the investigation, "including the FBI," he would sue her for defamation of character. Miller also stated to Rains that the FBI was not looking into his business. Rains informed Miller that she had spoken with the FBI in December 2003 and that she had no other information to provide investigators.

After the filing of a criminal complaint, Miller was arrested. Because of Miller's criminal history, the court placed Miller on house arrest with electronic monitoring. The court appointed counsel to represent Miller. On June 1, 2006, the Grand Jury returned a five-count superseding indictment, charging Miller with two counts of committing wire fraud, in violation of 18 U.S.C. § 1343, two counts of money laundering, in violation of 18 U.S.C. § 1957, and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3). On July 21, 2006, Miller filed a pro se motion to remove his court-appointed counsel and to hire a new attorney. After Miller's then-counsel acknowledged in a pretrial hearing on the motion that Miller had refused to meet with him, Miller hired a new attorney, and the trial was continued to August 28, 2006.

Six days before trial, Miller violated the conditions of his pretrial release by returning to his home three and one-half hours later than permitted and giving misleading information to his pretrial services officer. Consequently, the court revoked Miller's bond pending trial.

At a pretrial hearing on August 28, Miller complained about the quality of the representation he was receiving from his newly-hired counsel. Counsel for Miller then stated that he was unable to represent Miller:

> Your Honor, for purposes of the record, if you will just wait a moment, your Honor, I have to look out for my welfare at this point. The Defendant and I just had a meeting, which deteriorated to a very violent nature.

---

[1]Miller and Rains are also loosely related by marriage, as Miller is the nephew of Rains's ex-husband.

* * *

> I was hoping while he sat in jail he would come to his senses but obviously has not. He is hostile to me. I cannot under the ethical situation even sit at the same trial table with him. So I have all the evidence here that he needs. I can give it to him and let him represent himself.

Despite the attorney's protestations, the district court denied the attorney's request to be removed as counsel. Regarding defendant, the district judge directed that "the Marshals will take whatever precautions they think are appropriate."

The Marshals Service determined that the use of an electronic restraint system was necessary and received permission from the district court to employ upon Miller a stun belt during trial. The Marshals provided notice to Miller regarding the use of the stun belt, instructing him that the "System if activated contains 50,000 volts of electricity" which can result in "Immobilization causing you to fall to the ground," the "Possibility of self-defecation," and the "Possibility of self-urination." The instructions provided further that the system would not be activated "simply for consulting with your legal counsel," but that it could be triggered by any of the following actions: "hostile movement or attempted assault," "tampering with the System," "attempt to escape custody," or "intentional attempt to avoid constant visual contact by the Deputy." Miller raised no objections to the use of the stun belt.[2]

Following a three-day trial, the jury found Miller guilty on all five counts charged in the indictment. The Presentence Investigation Report ("PSR") calculated an advisory Guidelines range of 84 to 105 months of imprisonment, based on Miller's offense level score of 22 and criminal history category VI. The PSR noted further that the maximum term of imprisonment under 18 U.S.C. § 1343 for the wire fraud counts was 20 years.

At the sentencing hearing, the government sought a sentence of 105 months of imprisonment. The court, citing Miller's criminal history and propensity for fraud, sentenced Miller to an above-Guidelines term of 125 months of imprisonment on counts one and two, and a term of 120 months on counts three through five, running concurrently.

Miller now timely appeals his convictions and sentences.

II.

Miller first argues that his constitutional right to a fair trial was denied when the district court forced him to wear a stun belt restraint during trial. Specifically, Miller contends that the court erred by failing to hold a hearing and make factual findings regarding the need for the physical restraint. The government argues that because Miller received sufficient notice of the limited number of actions that could trigger the stun belt and that the stun belt was never visible to the jury, he was not prejudiced by the use of the stun belt. We agree with Miller that the district court abused its discretion in failing to hold a hearing and make factual findings regarding the need for the stun belt. However, after our review for plain error, we hold that error requiring reversal did not occur.

---

[2]On November 27, 2006, nearly three months after the conclusion of trial, Miller filed a pro se "Motion to Declare a Mistrial," arguing that the use of the stun belt deprived him of his ability to consult with his counsel due to his concern for being electrocuted. Miller's motion, however, was untimely, as a motion for a new trial "grounded on any reason other than newly discovered evidence must be filed within 7 days after verdict or finding of guilty." FED. R. CR. P. 33(b)(2).

A.

We review the district court's decision to impose physical restraints on defendant for an abuse of discretion. *Kennedy v. Cardwell*, 487 F.2d 101, 107 (6th Cir. 1973). Further, any error in requiring defendant to be restrained is subject to harmless error review. *Ruimveld v. Birkett*, 404 F.3d 1006, 1012 (6th Cir. 2005); *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005); *see also Bell v. Hurley*, 97 F. App'x 11, 16 (6th Cir. 2004). Where the defendant fails to object to an error at trial, we review for plain error. FED. R. CR. P. 52(b); *United States v. Christman*, 509 F.3d 299, 307 n.3 (6th Cir. 2007).

B.

The use of physical restraints, such as a stun belt, during trial and the sentencing phase implicates a defendant's right to due process. *Deck v. Missouri*, 544 U.S. 622, 629 (2005). *Deck*, and the bulk of federal cases discussing the use of physical restraints during trial and sentencing, involved traditional methods of securing the accused, such as handcuffs and shackles. Nevertheless, we now conclude that the "same fundamental issues are implicated in the decision of the district court" to restrain a defendant through the use of a stun belt. *United States v. Waagner*, 104 F. App'x 521, 526 (6th Cir. 2004). Accordingly, we hold that "'a decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints.'" *Id.* (quoting *Gonzalez v. Pliler*, 341 F.3d 897, 901 (9th Cir. 2003)). Further, we caution that such "physical restraints should be used as rarely as possible." *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir. 2002).

Because significant interests are implicated by the use of restraints, before ordering the use of such devices, the trial court must make a "determination, in the exercise of its discretion, that [restraints] are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. Twenty-two years before *Deck*, we explained the proper procedure that a trial court should follow before permitting the use of restraints:

> The recent cases establish that in order for an appellate court to undertake any meaningful review at least the reasons for the trial judge's actions should be placed on the record. Several courts, including this one, have recognized that the physical indicia of innocence are so essential to a fair trial that the better practice is to hold a hearing so that factual disputes may be resolved and evidence of the facts surrounding the decision are made a part of the record.

> * * *

> While the cases have laid down no definite rule as to the exact form for an evidentiary hearing to determine whether physical restraint is necessary, we think that it is preferable, except in cases where the trial process is disrupted in the court's presence, that a formal hearing should be conducted with sworn testimony. In this way factual disputes may be resolved and a meaningful record preserved for an appeal or for collateral relief.

*Kennedy*, 487 F.2d at 107, 110 (internal citations omitted). On appeal, Miller argues that the district court erred in permitting the use of restraints before making any findings regarding the need for such measures. We agree.

It appears that the use of the stun belt was triggered by the statement by Miller's counsel during the pretrial hearing on August 28 that he had a meeting with Miller that devolved "to a very violent nature." Nevertheless, the district court neither held an evidentiary hearing nor received any evidence regarding the need to restrain Miller. The court did not articulate why it concluded that

the use of a stun belt was necessary.  Rather, the trial court deferred initially to the Marshals for the means necessary to prevent any further violent interactions involving Miller, stating "the Marshals will take whatever precautions they think are appropriate."  Later, the court approved, without explanation, the Marshals' decision.

We have held previously that a district court's blind adherence to a corrections officer's recommendation, without making any individualized determinations or specific findings, amounts to an abuse of discretion.  *Lakin*, 431 F.3d at 964 (holding that "[a]lthough a trial court might find a corrections officer's opinion highly relevant to answering the ultimate inquiry as to whether shackling is necessary in a particular case, an individualized determination under the due process clause requires more than rubber stamping that request").  In this case, the district court's cursory approval of the use of a stun belt fell far below the individualized determination required by *Deck*, *Kennedy*, and *Lakin*.  By deferring to the Marshals' judgment, the district court abdicated its responsibility and thus abused its discretion.

Additionally, we are troubled by the government's argument on appeal that the use of a stun belt was warranted because Miller was facing significant prison time and because Miller had been evasive and untruthful in a prior hearing before the district court.  Although we do not condone Miller's behavior with the district court, neither of these factors justifies the use of physical restraints.  As the Court explained in *Deck*, "the Constitution forbids the use of visible shackles . . . unless that use is justified by an essential state interest – such as the interest in courtroom security – specific to the defendant."  544 U.S. at 624 (internal quotation omitted).  In our view, neither Miller's lack of honesty nor his potential prison sentence – without evidence indicating that he posed a threat to courtroom security – suffices as such an essential interest.  Were we to accept the government's position that the length of Miller's potential sentence was an adequate basis to justify the use of the stun belt, the implementation of physical restraints would become essentially routine in federal drug and firearm prosecutions.  This is clearly beyond what the Constitution permits.  *Id.* at 626.

## C.

Our conclusion that the district court abused its discretion by failing to hold a hearing and make findings regarding the need for the stun belt does not end our analysis.  Trial errors – even "non-structural" constitutional errors – are subject to harmless error analysis on review.  *See Neder v. United States*, 527 U.S. 1, 7-8 (1999); *Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991) (opinion by Rehnquist, C.J.).  In *Deck*, the Supreme Court confirmed that harmless error analysis applies to the use of physical restraints on a criminal defendant at trial.  *Deck*, 544 U.S. at 635.

Unlike the defendant in *Deck*, however, Miller did not object to the use of physical restraints.  Thus, as both parties concede, we review the use of the stun belt for plain error.  *See United States v. Fields*, 483 F.3d 313, 356 (5th Cir. 2007) (applying plain error review where defendant did not object to the use of a stun belt at trial).  Under a plain error analysis, Miller must show "(1) error (2) that was obvious or clear (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Phillips*, 516 F.3d 479, 487 (6th Cir. 2008) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)).  This is a heavy burden for Miller to bear, for "the plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice."  *Phillips*, 516 F.3d at 487 (quoting *United States v. Cox*, 957 F.2d 264, 267 (6th Cir. 1992)).

Perhaps the most significant consequence of applying plain error review to Miller's claim is that the burden of proof is on Miller to prove that he was prejudiced by the use of a stun belt at trial.  *United States v. McCreary-Redd*, 475 F.3d 718, 723 n.5 (6th Cir. 2007) (noting that "'in contrast to harmless error review, plain error review puts the burden of proving a deprivation of

substantial rights on the defendant and further requires the defendant to persuade the court that the error 'seriously affected the fairness, integrity or public reputation of judicial proceedings'") (quoting *United States v. Valdez*, 362 F.3d 903, 908 (6th Cir. 2004)).  We hold that Miller has not met his burden.

First, Miller makes little effort on appeal to explain how he was prejudiced by the use of the stun belt.  He does contend that he was "forced to sit through his entire jury trial under the constant threat of having 50,000 volts of electricity shot through his body, knowing that, if the belt was triggered, a massive electrical shock would force him to the ground and likely cause him to defecate and urinate on himself" and this threat "stifled [his] ability to communicate with his counsel due to the threat of being electrocuted."  This argument, however, contradicts the statement made by his counsel at the close of the trial:

> Your Honor, on behalf of the defendant, we meant to put this on the record before the jury came out, but as far as the problems that we had between us, the defendant and myself, the Court is well aware of that.

> I want the record to be clear that there were no witnesses given to me by the defendant to subpoena or to testify on his behalf.  We discussed that, and that's why no witnesses were presented.

> *During the trial, he did finally consult with me, and we were able to get along during the trial*.  The Court knows the history of this case, but I want the record to be clear that no witnesses were called because I had no witnesses to call.[3]

(Emphasis added.)  Miller did not dispute his counsel's statement, and there is no evidence  in the record to contradict the attorney's account that Miller was able to confer with counsel at trial.  Thus, we cannot conclude that Miller was prejudiced in his ability to aid in his own defense at trial.

On appeal, the government represents that the stun belt was not visible to the jury.  However, the trial record is silent regarding whether the stun belt was visible to the jury at trial.  Because Miller bears the burden of proof on plain error review, we will not assume without evidence that the stun belt was visible at trial.[4]  Consequently, because there is no evidence indicating that the stun belt was visible to the jury, Miller has not met his burden to show that he was prejudiced in the eyes of the jury by the use of the physical restraint.  *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000) (holding that where there is no evidence in the record that any member of the jury noticed the stun belt, the court will not "presume prejudice"); *United States v. Mayes*, 158 F.3d 1215, 1226-27 (11th Cir. 1998) (where no evidence that restraints were visible, no prejudice); *United States v. Collins*, 109 F.3d 1413, 1418 (9th Cir. 1997) (same).  *See also United States v. Orris*, 86 F. App'x 82, 86 (6th Cir. 2004) (holding that although district court "should have more clearly stated on the record, based upon facts in the record, the reasons he believed that shackling Defendant was necessary," reversal was not appropriate because "there is no indication whatsoever in the record that the shackling prevented Orris from consulting with his attorney, was ever seen by the jury, or otherwise prejudiced Orris"); *Pearl v. Cason*, 86 F. App'x 858, 859 (6th Cir. 2004)

---

[3]Earlier, counsel for Miller made a similar reference to his ability to consult with defendant: "I want the Court, for purposes of the record, or I'll put it on the record, that the defendant and I had discussed him testifying many times over, and I explained to him that he has a constitutional right to testify if he chooses to, but because of his record involved in the case, it was his decision not to testify based on my advice, so the record is clear."

[4]The Seventh Circuit has "described the use of a stun belt as a 'method[] of restraint that minimize[s] the risk of prejudice' because it is hidden beneath a defendant's clothing." *Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007) (quoting *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997)).

(finding no prejudice to shackled defendant where defendant "presented no evidence that the jury saw the shackles at any point" and "presented no evidence to support his conclusory allegations that the shackles impeded his mental faculties, interfered with communication with his lawyer, detracted from the dignity of the proceedings, and caused him pain").

Finally, Miller does not challenge on appeal the weight or sufficiency of the evidence offered against him on the wire fraud and money laundering counts.[5] Thus, Miller has not shown that his convictions for these offenses resulted in a miscarriage of justice or suggested that any potential prejudice may have played a significant part in the jury's determination of guilt.

For these reasons, we hold that Miller failed to carry his burden on plain error review to establish he was prejudiced by the use of the stun belt at trial.

III.

Next, Miller argues that the district court should have ordered sua sponte a hearing to determine whether he was mentally competent to stand trial. We hold that the district court did not err in failing to order sua sponte a competency hearing.

Title 18 U.S.C. § 4241(a) requires a district court, if reasonable cause exists to believe that a defendant is mentally incompetent to stand trial, to order sua sponte a hearing to determine the defendant's competency. A criminal defendant is incompetent if he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or if he does not have "a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (internal quotations omitted). In determining a defendant's competence, the court considers several factors, including "evidence of a defendant's irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial." *Id.* at 180.

Miller seizes upon a statement made by the district court during a hearing on the morning before the first day of trial. Responding to difficulties that Miller's counsel was having in communicating with his client, the court stated to Miller:

> As I said to you the other day, I have gone through a lot with you. *I don't know what is going on in your head or not going on in your head.* You have a long record of criminal convictions, so you are experienced in this process.
>
> * * *
>
> You had all the rope that I am going to give you because I could, I suppose, refer you and say that there is some mental problem. I *don't know whether there is a mental problem with you. There is nothing in the record to indicate that, I don't know, there could be.*
>
> But that means you would be shipped off again at Government expense down to Missouri somewhere and put in a mental hospital, and I would then expect you to cooperate with the people, the psychologists, social workers, psychiatrists. I have no expectation that you would do that based on everything I have seen so far. So you have two hours to make amends with your lawyer and be back here.

---

[5]As discussed *infra*, Miller challenges, on First Amendment grounds, the sufficiency of evidence supporting his conviction for witness tampering.

(Emphasis added.) Miller argues that these passages suggest that the district court doubted Miller's competency, therefore triggering the requirement under 18 U.S.C. § 4241(a) to hold a hearing on Miller's competence to stand trial. Miller also points to the PSR, in which the probation officer stated that "this officer believes the defendant needs a mental health evaluation and possibly counseling. Throughout the defendant's bond supervision and the investigation conducted by this officer, Mr. Miller has displayed signs of paranoia and other symptoms which make this recommendation necessary."

Two cases cited by the government in response are instructive. In *United States v. Leggett*, 162 F.3d 237 (3d Cir. 1998), the Third Circuit rejected the appellant's claim of incompetency based on his inability to assist in his own defense. The appellant argued that his incompetency should have been evident to the district court at a pre-trial hearing in which the defendant sought dismissal of his counsel because of their inability to communicate. *Id.* at 242. The court rejected his claim, noting that the defendant had participated in his own defense and that his "desire to have [his attorney] discharged was at least partially grounded in what he considered poor strategic decisions on her part and her failure to get him copies of various evidentiary documents. . . . Leggett's reasons for seeking [his attorney's] discharge stemmed from his relationship with that particular lawyer and did not seem indicative of a general incapacity to consult with any lawyer." *Id.* at 243.

Likewise, in *United States v. Shan Wei Yu*, 484 F.3d 979, 985 (8th Cir. 2007), the Eighth Circuit considered the appellant's claim that the district court should have ordered a mental competency hearing because the defendant had been taking prescription medication for mental health problems and because he had complained to the court about the performance of his attorneys. On appeal, the court rejected the appellant's claim, noting that "[n]o party suggested at trial . . . that Yu was incompetent or unable to understand the proceedings," and reasoning that "Yu's complaints about his attorneys . . . evidence that Yu understood the case against him and was capable of consulting with counsel." *Id.* at 985.

As these cases demonstrate, a defendant is not rendered incompetent to stand trial merely because he cannot get along with his counsel or disapproves of his attorney's performance. Moreover, although there is evidence in the record that suggests Miller may show signs of paranoia, such an illness would not necessarily render defendant incompetent to stand trial. *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996) ("Although there is some suggestion in the record that the defendant is currently under psychiatric care, even if she were mentally ill, 'it does not follow that because a person is mentally ill he is not competent to stand trial.'") (quoting *Newfield v. United States*, 565 F.2d 203, 206 (2d Cir. 1977)).

The record suggests that the district court's remark that he didn't know whether Miller had a "mental problem" is best interpreted in the context of the court's exasperation with the difficulties that Miller had caused the court and his attorneys in the weeks leading to trial. During this same exchange with Miller, the court reminded Miller that he had previously moved the trial date because Miller had sought to change attorneys, that the court had – "against [its] better judgment" – permitted Miller to await trial on house arrest, that Miller had violated the conditions of house arrest, and that Miller had discovered the resources necessary to retain counsel despite his earlier statements to the court indicating that he lacked any funds to pay for representation.

To the extent that these difficulties called into question Miller's ability to assist in his own defense, this concern was answered by his attorney's statement at the conclusion of trial that Miller did, in fact, consult and assist in his defense at trial, and that Miller had knowingly accepted the advice given to him by counsel not to testify before the jury. In addition, in a pretrial hearing regarding a motion to withdraw filed by his first attorney, Miller demonstrated that he understood the proceedings and their consequences. In response to the court's question as to how he could afford to retain his own counsel, Miller stated "I am borrowing the money from five different people.

*This is my life that is on the line here. At the end of the day, he gets to go home and so does everybody [else]. If I lose, I am going to jail for a long time.*" (Emphasis added.)

Moreover, neither of Miller's trial attorneys raised any question at or before trial regarding Miller's mental health.[6] *See United States v. Tucker*, 204 F. App'x 518, 520 (6th Cir. 2006) (holding no error in failure to hold competency hearing after noting that "three separate attorneys represented Tucker and none of them expressed personal concern about Tucker's competence"). Nor is there any evidence of mental health problems in the record. *Cf. Davis*, 93 F.3d at 1290. Rather, the record shows that Miller was able to consult with his attorney during trial, engage in colloquies with the district court during pretrial hearings, and make an informed decision regarding his desire to testify at trial.

Finally, we note that the bar for incompetency is high: a criminal defendant must lack either a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him." *Drope*, 420 U.S. at 172 (internal quotations omitted). Because Miller demonstrated that he could consult with his attorney and that he understood the nature of the proceedings, we conclude that reasonable cause did not exist regarding whether defendant was competent to stand trial. Accordingly, we hold the district court did not err in failing to order sua sponte a competency hearing.

## IV.

Next, Miller challenges the sufficiency of the evidence offered against him at trial to support his conviction for witness tampering. He argues that the threat of exercising his right to sue for defamation is not a threat for purposes of criminal liability under 18 U.S.C. § 1512(b)(3). We disagree.

At the close of evidence, Miller moved for acquittal. We review de novo the district court's denial of Miller's motion for acquittal and must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007).

Title 18 U.S.C. § 1512(b) provides:

Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings . . . shall be fined under this title or imprisoned not more than 20 years, or both.

---

[6]At the sentencing hearing, Miller's second trial attorney did question Miller's mental health:

I note in the probation report, which is very accurate under the mental health and emotional health section, paragraph 62 and 63 sort of sums up to me why Shawn has done the things that he did. His attitude in the way he acts, not only the way he's acted in the courtroom but the way he acted outside the courtroom, I think that he does need to be examined. I think he did have some emotional and mental problems.

At no point, however, did defendant's counsel suggest that Miller may have been rendered incompetent to stand trial due to these mental and emotional problems.

18 U.S.C. § 1512(b)(3). *See also United States v. Khatami*, 280 F.3d 907, 911 (9th Cir. 2002) ("By its terms, § 1512(b) prohibits four specific categories of conduct directed toward witnesses: (1) intimidation, (2) physical force, (3) threats, and (4) corrupt persuasion.").

Miller argues that his statement to witness Sherry Lynn Rains that he would sue her for defamation if she spoke with the FBI regarding its investigation of defendant cannot be considered a "threat" within the meaning of § 1512 because he has the legal right to initiate legal proceedings. His argument, however, is seriously flawed because it rests upon an inaccurate assumption. Although Miller claims that he has the right to file a defamation claim against Rains, "there is no constitutional right to file frivolous litigation." *Wolfe v. George*, 486 F.3d 1120, 1125 (9th Cir. 2007) (observing that "[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, . . . baseless litigation is not immunized by the First Amendment right to petition"). The problem with his argument is that Miller threatened to sue Rains for defamation solely on the basis of her cooperation with the FBI, regardless of the veracity of Rains's statements to investigators. Miller has no right to institute baseless legal proceedings for the purpose of harassment, and cannot hide behind the First Amendment to shield him from prosecution under § 1512.

Although we have not had many opportunities to discuss § 1512, we find *United States v. Bryant*, 966 F.2d 1454 (Table), 1992 WL 133018 (6th Cir. June 12, 1992), instructive. In *Bryant*, the defendant William Ackison, the Ironton (OH) chief of police, was convicted on two counts of tampering with a witness, in violation of § 1512(b)(1) and § 1512(c)(2). The underlying incidents occurred during an FBI investigation into the conduct of a fellow Ironton police officer, in the course of which the FBI informed Ackison that it would be interviewing all of the Ironton officers. *Id.* at *3. Ackison responded by sending a memorandum to the entire police department, which informed officers of the investigation and stated that "[n]o personnel of this department has to talk to [the FBI investigator] if they do not wish to." *Id.* Several members of the police department testified that they interpreted the memorandum to mean that Ackison did not want Ironton officers to speak to the FBI, and two officers testified that Ackison either stated explicitly, or implied suggestively, that they would be fired if they cooperated with the FBI investigation. *Id.* On review of the sufficiency of the evidence, this court held that "there was abundant evidence to support all of the convictions of both defendants," including Ackison. *Id.* at *4.

Like Ackison, Miller ordered Rains not to cooperate with an ongoing investigation and stated that negative pecuniary effects would occur if she disobeyed his direction. On cross-examination, Rains testified that she considered Miller's order to be a threat, explaining that Miller "threatened to take me to court and sue me for defamation of character. If that's a threat, then yes, that's a threat."

We hold that, viewing the evidence in the light most favorable to the government, the jury could have reasonably accepted Rains's testimony that Miller's statement was a threat and could have reasonably inferred that it was made for the purpose of preventing communication to the FBI in connection with its investigation of Miller. Miller's conviction is affirmed.

V.

Finally, Miller argues that his sentence was unreasonable. Miller raises two arguments. First, Miller contends that the district court erred in imposing a four-year term of supervised release, as the statutory maximum provided in 18 U.S.C. § 3583(b)(2) is three years of supervised release. The government concedes this error and acknowledges that a limited remand for resentencing is necessary to correct the district court's mistake.

Second, Miller argues that the court erred by sentencing Miller to a term that exceeded the Guidelines, contending that the court placed too much weight on Miller's criminal history to justify the sentence. We review Miller's sentence for reasonableness, using an abuse-of-discretion standard to determine whether the sentence is reasonable. *United States v. Carter*, 510 F.3d 593, 600 (6th Cir. 2007) (citing *Gall v. United States*, 128 S. Ct. 586, 594-95 (2007)). "In reviewing a challenge to the length of an outside-guidelines sentence, [the court] may 'take the degree of variance into account and consider the extent of a deviation from the Guidelines,'" but it "'must give due deference to the district court's decision that the § 3553(a) factors . . . justify the extent of the variance.'" *United States v. Smith*, 516 F.3d 473, 477-78 (6th Cir. 2008) (quoting *Gall*, 128 S. Ct. at 595, 597). We conclude that the court did not abuse its discretion in sentencing Miller to a term of 125 months of imprisonment.

Before sentencing, the probation office calculated an advisory Guidelines range of 84 to 105 months. Neither party disputes that this calculation was correct.[7] At the sentencing hearing, counsel for the government suggested that "there is a lot of argument to be made to sentence Mr. Miller much higher than the advisory guideline range," but ultimately the government requested a sentence of 105 months. Nevertheless, the district court exceeded the government's recommendation, sentencing Miller to a term of 125 months of imprisonment. The court explained:

> I'm not going to count up all the prior convictions because you have 21 points, but realistically you could have a lot more. And I don't know how many felony convictions, but there are probably 15 or 20 felony convictions, or even more if we added up all the counts. That gives me an idea that there is a huge long history of fraud. And somehow you're not getting it. I know when you said you were 19 you were young, but then you go to jail a little bit. You get out, you're 23, and you do some more, and you get out and do some more.
>
> You get into the state system, and this is what happens, and for good or for bad that's why we have Sentencing Guidelines in Federal Court, because in the state system the judges can pretty much, in the cases of this nature, can do pretty much what they want. And you make a very good presentation. And I'm sure the judges were somewhat sympathetic and gave 18 months and running 8 or 10 or 12 counts or cases together was a stiff sentence. In fact, it turned out to be nothing like that at all because it didn't dissuade you from your conduct.
>
> Now we're in a situation I can give you 20 years on counts 1 and 2. And that under some circumstances you know that might seem to be appropriate because you need to be stopped. You need to be stopped committing this type of activity. You know how to use the computer. You have access to people's financial records. You're good at all this. You have to take steps back and say you can't do this anymore. I'm not quite sure how to stop you.
>
> I tried to be fair in all my dealings with you. But I also have an obligation under the law to take into consideration everything that the Guidelines and that 3553 says that I must take into consideration. And I have to agree with Mr. Roberts, and that is that a sentence within the guideline range would be a sentence that would extend an extraordinary amount of mercy under all of the facts and all of the circumstances in the case. Under 3553(a) it appears to me that your long and extensive continuing

---

[7] Miller does argue, with regard to his sufficiency-of-the-evidence challenge to the witness tampering conviction, that he should not have received a two-point increase for obstruction of justice. Because we conclude that there was sufficient evidence to support the conviction, however, Miller's argument is not well-taken. Miller has not identified any other miscalculations in the PSR.

history of fraudulent activity without stop, respite, other than when you are locked up, would give me a reason to vary in an upward direction.

What I am going to do, Count 1 and Count 2 I am imposing, placing you in the custody of the Bureau of Prisons to be imprisoned for 125 months, and Counts 3, 4, 5, 120 months, all to run concurrent with each other, followed by four years of supervised release. And there is a $100 special assessment to be paid on each count of the conviction.

The court then ordered Miller to pay $225,453.09 in restitution.

Miller argues that the court placed disproportionate weight on his criminal history and that his criminal background was an inadequate basis for the court to exceed the Guidelines. However, as the government asserts, we have repeatedly approved upward departures from the Guidelines when the sentencing court concludes that the Guidelines calculation does not adequately reflect the defendant's criminal history. *See United States v. Smith*, 474 F.3d 888, 893-94 (6th Cir. 2007) (affirming sentence of 57 months after upward departure, from range of 30-37 months, pursuant to U.S.S.G. § 4A1.3); *United States v. Matheny*, 450 F.3d 633, 640-41 (6th Cir. 2006) (affirming sentence of 36 months of imprisonment where upper limit of Guidelines range was 30 months). Moreover, these cases pre-date *Gall*, in which the Supreme Court emphasized the discretion given to district courts in making sentencing determinations and pointed out the structural advantages possessed by the district court that justifies this discretion:

The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record. The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court. Moreover, district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do.

*Gall*, 128 S. Ct. at 597-98 (internal quotations and citations omitted).

In the wake of *Gall*, we have continued to emphasize the deference owed to a district court's assessment of the § 3553(a) factors. *See Smith*, 516 F.3d at 478 ("[i]n view of the deference [the appellate court] owe[s] the district court's assessment that the § 3553(a) factors justify the extent of the variance," affirming sentence of 72 months, despite Guidelines range of 41-51 months, where the district court justified sentence due to defendant's "'previous record of fraudulent conduct'" and defendant's "'additional fraudulent conduct' committed when released on bond") (internal quotations omitted); *United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008) ("Measured by *Gall's* requirements and above all by *Gall's* deference to district court judges at sentencing, the district did not commit reversible error in reducing Grossman's sentence from 120 months to 66 months.").

Here, the district court considered both Miller's lengthy criminal history and the consequences of his fraud. The court referenced testimony by a Mr. Applebaum, whose wife was a victim of the fraud and "became so much depressed and got to a point where she didn't think she could go on, and in fact killed herself." The court remarked that it found this testimony "very persuasive." Thus, the court considered not only Miller's history and characteristics, *see* 18 U.S.C. § 3553(a)(1), but also the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the offense and to provide just punishment. § 3553(a)(2)(A). Moreover, the court's remark that Miller "need[s] to be stopped [from] committing this type of activity" reflects

its consideration of the need to protect the public from further crimes committed by defendant. § 3553(a)(2)(C).

Finally, we note that at the sentencing hearing, Miller's counsel did not identify any basis warranting a shorter sentence. Rather, after acknowledging Miller's "long background," counsel "ask[ed] the Court to be as lenient as possible, certainly, to not go outside the Guidelines, and also consider a departure from the Guidelines." Counsel continued: "I'm going to ask the Court to do what the Court feels is right with him, you know all about his background, you've seen him in action and seen him in Court, and hand out an appropriate sentence like the Court always does." Thus, at sentencing, Miller did not provide any counterweight to counteract his lengthy criminal history.

Accordingly, we hold that the district court did not abuse its discretion in sentencing Miller to a term of 125 months of imprisonment.

## VI.

For these reasons, we affirm Miller's convictions and remand for resentencing, limited to correcting the length of Miller's term of supervised release.