**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0678n.06

**No. 08-6475**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Nov 04, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| MICHAEL GILL WILSON, aka Nichi | ) | |
| Senjuro, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

**Before: GRIFFIN and WHITE, Circuit Judges; MURPHY, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge.** Michael Wilson challenges the district court order finding him competent and denying his motions to withdraw his guilty plea. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

According to an "Agreed Factual Basis" signed by the parties, on the evening of July 6, 2006, a Knox County 911 operator received a call from Michael Wilson's wife. Wilson's wife reported that Wilson had removed a rifle from their Knoxville home and shot it from somewhere behind the house. A neighbor had heard what she thought was a gunshot and saw Wilson sitting in the woods. When the neighbor approached Wilson, he stated that he was celebrating and had lit a cherry bomb. Wilson promised not to cause any more trouble and the neighbor returned to her house.

---

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

Shortly thereafter, police officers arrived in response to the 911 call. Wilson remained in the woods and a standoff with police ensued, lasting several hours. Wilson eventually left the woods and was taken into custody. Later, after being advised of his rights, Wilson admitted possessing the rifle and stated that it was in his camp in the woods where he had been staying. Officers searched the woods and found a loaded rifle at Wilson's makeshift campsite, along with prescription medication bearing Wilson's name and other items belonging to Wilson.

The parties also agreed that Wilson previously had been convicted of multiple offenses punishable by terms of imprisonment of more than a year, and that the rifle was manufactured outside of Tennessee.

On July 18, 2006, a grand jury in the Eastern District of Tennessee returned an indictment charging Wilson with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). The parties prepared for trial, but on the eve of trial, Wilson informed his counsel that he wished to plead guilty. On January 8, 2007, Wilson signed the plea agreement and the Agreed Factual Basis.

At the change-of-plea hearing, the court engaged Wilson in a colloquy, asking, among other questions, whether Wilson had ever been treated for mental illness or addiction to drugs. Wilson answered "No." The court also asked Wilson whether anyone, including an officer or agent of the government, put "any pressure on you, mental or physical" to force him into pleading guilty. Wilson responded, "No. Except that I am wanting to get to a mental health treatment process. I am not having a good time. I have some mental problems, that is all." The court accepted Wilson's guilty plea, concluding that Wilson was "fully competent and capable of entering an informed plea."

-2-

Later in the hearing, Wilson's counsel (Mr. Lomonaco) asked that Wilson be sent to a medical facility prior to sentencing and mentioned that Wilson had received mental health treatment in the past. The following exchange took place:

> The Court: Okay. Has he received mental health treatment you say in the past?
>
> Mr. Lomonaco: He has. I know you asked him that question. He may not have understood exactly what you were saying. He has had counseling. You want to tell the judge what kind.
>
> Mr. [Wilson]: I was found legally insane by the courts. I have been committed three different times in the state of Colorado.
>
> Mr. Lomonaco: You have never been found legally insane on a criminal case though.
>
> Mr. [Wilson]: I have in Denver, Colorado in 1969[1]. . . . I was sent to the Colorado state hospital.
>
> Mr. Lomonaco: I was unaware of that charge, Your Honor. I knew he [] had mental problems in the past. It has been our experience with Mr. [Wilson] he has always been quite level headed with what was going on. . . .

The court noted that it had already accepted Wilson's plea, but determined that Wilson needed to be evaluated. The court stated, "should the . . . forensic evaluation [] determine that he was . . . either incompetent to understand the nature of the charge against him and to assist his attorney or was in fact insane at the time of the charged offense, we'll reconvene and reconsider the plea." The court ordered that Wilson be committed for psychological examination, and that his examiners address: "1) whether the defendant is suffering from a mental disease or defect rendering him

---

[1]The presentence report states Wilson's legal-insanity claim as fact. *See* PSR at 17. Forensic examiner Dr. Dana's review of Wilson's medical records characterizes the claim as information supplied by Wilson. However, the parties seem to agree that, in Wilson's long history with the criminal justice system, he has never been found legally *incompetent*.

mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist proper[l]y in his defense; and 2) whether defendant suffered from such mental disease or defect which rendered him insane at the time of the offense charged."

On May 18, 2007, a Bureau of Prisons (BOP) forensic psychologist, Jason V. Dana, Psy.D., filed a 20-page report and addendum concluding that Wilson was sane at the time of the offense and was competent to proceed. Wilson was also evaluated by Dr. Sidney Alexander, a private psychiatrist. On April 17, 2008, Dr. Alexander submitted a letter to the district court that addressed Wilson's mental state at the time of the offense.

On May 30, 2008, Wilson's counsel filed a motion to withdraw Wilson's guilty plea.[2] The motion attached a second letter from Dr. Alexander noting the "uncertainty of Mr. [Wilson]'s competency to make sound decisions about his legal case" and concluding that Wilson's mental condition "negatively and significantly impacted his ability to freely, knowingly and voluntarily change his plea from not guilty to guilty."

On August 29, 2008, the district court held an evidentiary hearing at which Drs. Dana and Alexander testified.

Dr. Dana evaluated Wilson at a BOP medical facility over a period of 75 days. Dana also reviewed Wilson's extensive medical records, particularly Wilson's long history of mental-health treatment, beginning in 1962, and including voluntary admissions, commitments, admissions for the purpose of determining competency to stand trial, and treatment while in prison. Dr. Dana also

---

[2]Prior to that, on December 21, 2007, Wilson, *pro se*, had filed a document construed by the district court as a motion to withdraw his guilty plea.

reviewed BOP security designation data, and evidence from the instant offense, including the police cruiser videos of Wilson's interviews with Knoxville police. Dr. Dana diagnosed Wilson with malingering[3] and antisocial personality disorder with narcissistic traits.

With regard to Dr. Alexander's contrary conclusions, Dr. Dana emphasized that his own examination was in the "forensic" context while Dr. Alexander's was in the "therapeutic" context, explaining that the latter tends to rely on self-reporting. Dr. Dana's role caused him to focus on whether Wilson was a reliable "self-reporter" who would report truthful information. Dr. Dana concluded that he could not rely on Wilson's self-reports of symptoms of mental illness because the information Wilson provided was difficult to verify or factually false. He offered several examples, including that although Wilson frequently claimed that he was a Vietnam veteran and a Marine sniper, and did so when he was arrested for the current offense, he is not a veteran and was not a Marine sniper. Dr. Dana testified that Wilson told the lie in various settings to obtain (prescription) drugs or to curry favor with law enforcement. Dr. Dana further testified that Wilson's statements about being a veteran were not delusional because he altered his story when confronted with its inaccuracies. Wilson also complained that he had difficulty sleeping; however, while at the BOP medical facility, he was observed sleeping all night and sometimes into the afternoon. Wilson additionally claimed to experience frequent memory loss and confusion, along with difficulty concentrating. However, at the facility, he was observed playing chess for hours at a time. Further,

---

[3] Dr. Dana explained in his report that malingering "occurs in situations where an individual feigns the presence, or severity, of psychological symptoms as a result of an identifiable external incentive." (R. 30 at 13.)

Wilson was assessed with a score of 31 on the Test of Memory and Malingering (TOMM), designed to evaluate the reliability of the answers he provided; any score below a 46 out of 50 is regarded as reflecting an intentional attempt to feign poor memory functioning.[4] Finally, Wilson reported having several different types of hallucinations (grey wolves with yellow eyes jumping at him from walls, clowns "building things," his attorney's eyes turning red), including olfactory hallucinations (his attorney smelling like a wet dog). Dr. Dana testified that visual hallucinations are "extremely rare," and olfactory hallucinations are even rarer. He also testified that untreated individuals generally experience the same type of hallucination over time, and that Wilson's "observed behavior outside the therapy interview sessions with me was completely inconsistent with the level of stress and discomfort associated with his reported hallucinations." Similarly, although Wilson during his evaluation told Dr. Dana that he saw the wolves with yellow eyes while he was in the woods at the time of the offense, the police documents from that time do not mention any reported hallucinations. Dr. Dana characterized Wilson's stated hallucinations as an attempt to malinger mental illness, "[b]ecause on the surface it appears very crazy. But in reality, it just doesn't happen like that."

Dr. Dana further opined that Wilson's numerous *pro se* court filings before and after the January 2007 plea hearing tended to demonstrate his competence at the time of the plea hearing. Dr. Dana's review of the court records did not reveal any indication that Wilson failed "to meet the standard of competency."

---

[4]Wilson was given a total of four tests to measure various aspects of his responses. Of these four, three indicated that Wilson was engaging in intentional poor responding.

Dr. Alexander met with Wilson on two separate occasions for about two hours each. He also reviewed Wilson's medical records, the police video, and Dr. Dana's report. On cross examination, Dr. Alexander testified that he did not recall having any significant disagreements with Dana's report. He agreed that the tests included in Dr. Dana's report showed that Wilson was "strongly malingering" and that there is a "high probability he malingers in many situations." But, Dr. Alexander testified, just because "someone can malinger many, many times in their life, it doesn't mean that they always malinger." He also stated that Wilson's malingering "is of a minor nature." He explained, "I think that [Wilson] kind of knows the system. He knows how to get various things, whether it is a trip to the medical clinic, a one-person cell – things more along that nature." Dr. Alexander stated that, while one could certainly interpret the responses Wilson gave him as malingering, at least some of Wilson's behavior was inconsistent with the usual reason for malingering in that Wilson did not derive any clear benefit. He noted that Wilson's plea defied logic because Wilson desperately wanted to avoid being in jail for the rest of his life.

Dr. Alexander's May 21, 2008, letter addressed Wilson's competency to continue the case, and his mental state at the time of his plea. According to Dr. Alexander's letter, Wilson 1) "almost certainly has some neuronal brain damage" resulting from vascular disease, and/or a chronic psychotic disorder, and/or substance abuse, and/or smoking and/or aging;[5] and 2) "may also have a recurrent psychotic mood disorder or [] paranoid schizophrenia." The letter states that, regardless of the precise diagnosis, Wilson should be treated for psychotic symptoms and depression and that

---

[5]On cross-examination, Alexander conceded that two previous neuronal evaluations of Wilson (in 1984 and 1995) were negative. (R. 72 at 40-41, 137.)

"[b]oth of these conditions only add to the uncertainty of [Wilson's] competency to make sounds

decisions about his legal case." With regard to Wilson's mental state at time of his plea, the letter

states,

> It is my opinion that [Wilson] was and is suffering from a mental defect that negatively and significantly impacted his ability to freely, knowingly, and voluntarily change his plea from not guilty to guilty. This decision is contradictory to his grave concerns about getting out of jail and thus illogical. I believe it speaks directly to his labile, impulsive, paranoid, and cognitively impaired mental functioning.

At the hearing, Dr. Alexander further testified that Wilson's diagnosis was "[m]ajor

depressive disorder, recurrent, fluctuating between moderate and severe with psychotic symptoms."

When asked whether Wilson's condition would meet the legal standard for being incompetent,

Alexander testified that, because Wilson's diagnosis "involves ebbing and flowing," there are times

when Wilson would be competent and times when he would not. Dr. Alexander further testified that

the medical records from the few days before and after Wilson's January 8, 2007, plea hearing

showed that he was experiencing a "depressive episode."[6] The previous October, a psychiatrist at

the Blount County Detention Facility diagnosed Wilson as having "major depressive disorder

recurrent with psychotic features." Dr. Alexander noted a medical record from three days after

Wilson's plea that observed that Wilson slept three to four hours or less, had increased depression,

and was crying several times a day. He testified that [Wilson] "had pretty much the same

---

[6]These were medical records from the Blount County Detention Center. Dr. Dana testified on cross-examination that he did not see these records. (R. 72 at 156-57, 166.) But, he stated that his opinion was not changed after hearing about them. (R. 72 at 166.) He noted that whenever Wilson had been diagnosed with mental illness in the past, it had been based upon Wilson's own self-reporting. *Id.*

observations consistently throughout those months." Dr. Alexander noted that on the day of the plea, Wilson was prescribed an "antipsychotic agent" (Seroquel), "[s]o clearly something more was occurring at that time." Dr. Alexander testified that Wilson's condition would cause him to be "frazzled, uncertain, have some impaired thought processing, impaired executive functioning," and concluded that Wilson was "less than clear headed" about the decision to plead guilty. Dr. Alexander also testified that Wilson told him that he did not recall pleading guilty, yet Wilson gave Dr. Alexander an explanation why he pled guilty.

The district court ruled on Wilson's motion from the bench at the conclusion of the hearing. The court noted that it had two intertwined issues to consider: whether Wilson was competent at the time he entered the guilty plea, and whether there was a fair and just reason for allowing Wilson to withdraw the plea.[7] With regard to Wilson's competence to plead guilty, the court observed that "when the defendant is presented with self-reporting and therapy sessions with a psychiatrist, he attempts to have severe emotional and mental problems. . . . On the other hand, when he is subjected to objective testing, that is by the forensic evaluations conducted by the psychologists, he comes out malingering. The court concluded that although Wilson had "mental problems . . . I don't think that he is mentally incompetent, or was at the time he entered the plea." With regard to the motion to withdraw, the court noted that its analysis was governed by the seven factors set out in *United States*

---

[7]The court did not address the issue whether Wilson was insane at the time of the offense. The parties did not object at the time, nor does either party raise the issue on appeal.

*v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994)[8], and denied the motion.  The court entered an order in accordance with its oral ruling on September 2, 2008.

A presentence report was prepared, to which Wilson did not object.  The district court held a sentencing hearing, and on December 5, 2008, the district court sentenced Wilson to 180 months in prison, the statutory mandatory minimum.  Wilson timely appealed.

**DISCUSSION**

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).  A criminal defendant is "incompetent if he lacks 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or if he does not have 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Miller*, 531 F.3d 340, 348 (6th Cir. 2008) (quoting *Drope*, 420 U.S. at 172); *see also Godinez v. Moran*, 509 U.S. 389, 396-99 (1993) (trial competency standard applies to guilty pleas).  In determining a defendant's competency, a court may consider several factors, including "evidence of a defendant's irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial." *Miller*, 531 F.3d at 348 (internal quotation marks omitted).  A district court's competency determination is a factual finding this court reviews for clear error. *Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005).

---

[8]*Bashara* was abrogated in part on other grounds by statute as recognized in *United States v. Caseslorente*, 220 F.3d 727, 734-35 (6th Cir. 2000).

Wilson claims the record demonstrates his incompetence at the plea hearing. Wilson cites his initial denial of having received mental-health treatment, followed by an almost immediate recantation, his medical problems while in the Blount County facility (hallucinations, depression, falling, seizures, sleep deprivation, the receipt of prescription medications), and Dr. Alexander's account of the effect of those problems (fluctuating sensorium, problems in perception and thought processing, and delusional thinking). Wilson also argues that the district court could not rely on its colloquy with him to conclude that he had knowingly and voluntarily pled guilty because he was impaired. He contends that – due to "fluctuat[ing]" thought processing – he did not decide to plead until the day of his trial. He also notes Dr. Alexander's testimony that Wilson later told him that he could not remember pleading guilty. Finally, Wilson points to the district court's acknowledgment at both the change-of-plea hearing and the motion-to-withdraw hearing that Wilson needed treatment.

Although Wilson's arguments find support in the record, the district court clearly credited Dr. Dana's testimony more than Dr. Alexander's testimony. The court found that when Wilson is evaluated by psychological professionals he "*attempts* to have severe emotional and mental problems" and that objective testing shows he malingers. The court did not clearly err in doing so. Dr. Dana had Wilson under observance for 75 days; Dr. Alexander met Wilson for a total of four hours. Dr. Dana submitted an extensive 20-page report and addendum; Dr. Alexander submitted two letters totaling under three pages. Dr. Dana administered several tests to ascertain the reliability of Wilson's self-reports; Dr. Alexander relied upon Wilson's own account. There are points in Dr. Alexander's favor – as an employee of the BOP, Dr. Dana is not a disinterested party, and Dr. Dana

is a forensic psychologist rather than a psychiatrist with prescribing capabilities. But these facts are discounted at least somewhat by Dr. Alexander's statement that he had little disagreement with Dr. Dana's report and his affirmance of the legitimacy and widespread acceptability of the objective assessments Dr. Dana used.

Wilson correctly observes that the Blount County detention facility records show Wilson's condition deteriorating leading up to the time of Wilson's guilty plea, and that Dr. Dana did not review these records, and thus, was not knowledgeable about their contents on cross-examination at the hearing. Still, on cross-examination Dr. Dana maintained that the records did not change his opinion and were not evidence of any "competency-related functional ability deficits." He relied on Wilson's demonstrated unreliability in self-reporting to conclude that diagnoses of mental illness by the Blount County staff would likely be incorrect. Dr. Dana had also previously cited Wilson's able *pro se* filings in the months before and after his January 2007 plea as tending to show his competence.

Dr. Dana gave legitimate reasons for his rejection of the Blount County records as demonstrating Wilson's incompetence during his guilty plea. The district court apparently found them convincing. Thus, it does not appear that the district court clearly erred in finding Wilson competent.[9]

---

[9]In addition, although the district court did not mention it, Wilson was found competent to stand trial twice before (in 1984 and 1991). *See* PSR 18, 19; *see also Miller*, 531 F.3d at 348 (court may consider prior medical opinions on competence).

Wilson also challenges the district court's denial of his motions to withdraw his guilty plea. We review the denial of a motion to withdraw a guilty plea for abuse of discretion. *United States v. Dixon*, 479 F.3d 431, 436 (6th Cir. 2007). The defendant has the burden to demonstrate that proper grounds exist for granting such a motion. *Id.* A district court abuses its discretion in this context if it: 1) "relies on clearly erroneous findings of fact," 2) "improperly applies the law or uses an erroneous legal standard," or 3) "commit[s] clear error of judgment in the conclusion it reache[s] upon a weighing of the relevant factors." *United States v. Ellis*, 470 F.3d 275, 280 (6th Cir. 2006) (internal citations and quotation omitted).

Under Federal Rule of Criminal Procedure 11(d)(2)(B), a defendant may withdraw a guilty plea prior to sentencing if he "can show a fair and just reason for requesting the withdrawal." The purpose of the Rule is "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *Dixon*, 479 F.3d at 436 (internal quotation marks omitted). In *United States v. Bashara*, this court explained several factors to consider:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

27 F.3d 1174, 1181 (6th Cir. 1994), *abrogated on other grounds by statute as recognized in United States v. Caseslorente*, 220 F.3d 727, 734-35 (6th Cir. 2000). These factors "are a general, non-

-13-

exclusive list and no one factor is controlling." *Ellis*, 470 F.3d at 281 (citation omitted). Each factor's relevance "will vary according to the circumstances surrounding the original entrance of the plea as well as the motion to withdraw." *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008) (citation omitted).

The district court's decision was somewhat truncated. It mentioned the seven *Bashara* factors, but offered no analysis of some factors and offered a minimal analysis as to several others. The court appeared to find that the first and second factors (amount of time between the plea and the motion to withdraw and the presence of a valid reason for the failure to move for withdrawal earlier, respectively) weighed in Wilson's favor. The court seemed neutral on the third factor, stating that whether Wilson had asserted or maintained his innocence was "in[] question one way or the other." The court did not specify how the fourth (circumstances underlying the entry of the guilty plea) and fifth (defendant's nature and background) factors affected its analysis. It seemed to find that the sixth factor weighed against Wilson, noting that it "ha[d] a lot of information about" Wilson's prior experience with the criminal justice system.[10] The court offered its most substantially explained rationale – ensuring the certainty of legal proceedings – under the heading of the seventh factor (governmental prejudice), despite the fact that this factor need not even be analyzed unless the defendant first establishes a fair and just reason for allowing the withdrawal of the plea. *See Ellis*, 470 F.3d at 286.

---

[10]This is consistent with Wilson's extensive criminal history. *See* PSR at 6-14.

Nevertheless, the court's articulation of its decision is adequate to permit review and a remand is not necessary. The court's rather cursory analysis under the *Bashara* factors is shored up by the prior portion of the oral ruling finding that Wilson was competent at the time he entered his plea. In his motion to withdraw, Wilson argued that he should be allowed to withdraw his plea because he was not competent at the time he gave it.[11] *See* R. 58 at 1 ("This motion to withdraw the plea pursuant to Rule 11(d) . . . [is] based on [Wilson's] claim of incompetence at the time the plea was entered."). Although the competency issue and the withdrawal-of-plea issue present distinct legal questions, the first part of the district court's oral ruling rejecting Wilson's incompetency claim undermines the basis of Wilson's withdrawal argument. Since Wilson linked the claims together, it is reasonable to read the court's decision as a whole, and read together with the court's rejection of the claim of incompetency, the district court's denial of the motions to withdraw Wilson's guilty plea is sufficiently explained and not an abuse of discretion.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[11]Wilson also argues on appeal that he was mentally and emotionally unstable *at the time of the offense*, and that this provides a fair and just reason for withdrawal of the plea. He did not make this argument before the district court. *See Mingus v. Butler*, 591 F.3d 474, 484 (6th Cir. 2010) (noting general rule that issues not presented to the district court are not properly before court of appeals).